

RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT
2014 AUG 27 PM 7: 12
FILING REPOSITORY

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MODERN MANAGEMENT )<br>SERVICES LLC, d/b/a THE MODERN )<br>HONOLULU, )<br>)<br>Petitioner, )<br>v. )<br>NATIONAL LABOR RELATIONS )<br>BOARD, )<br>)<br>Respondent. )<br>)<br>_____ ) | Case No. **14-1160** |

## PETITION FOR REVIEW

Comes now Petitioner Modern Management Services, LLC ("Petitioner"),

by its undersigned attorneys, and hereby petitions the United States Court of

Appeals for the District of Columbia to review and set aside the Decision and

Order of the National Labor Relations Board in NLRB Case Nos. 20-CA-072776,

20-CA-080437, 20-CA-081477, 20-CA-081478 and 20-CA-083330, all dated

August 18, 2014, and to stay enforcement of the NLRB Order pending this Court's

review and decision. A true and correct copy of the NLRB Decision and Order is

attached as **Exhibit A**, along with a Corporate Disclosure Statement.

DATED:  San Francisco, California August 27, 2014.

Respectfully submitted,
SEYFARTH SHAW LLP

By: _____
            BRIAN T. ASHE
Attorneys for Petitioner
MODERN MANAGEMENT SERVICES LLC
d/b/a THE MODERN HONOLULU

BRIAN T. ASHE (Cal. SBN 139999)
SEYFARTH SHAW LLP
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:  (415) 397-2823
Facsimile:   (415) 397-8549
bashe@seyfarth.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true, accurate and correct copy of the foregoing

PETITION FOR REVIEW was duly served by placing said documents in the U.S. Mail,

First Class Postage, and by Email on the following parties at their last known

address as follows:

Joseph Frankl, Regional Director          joseph.frankl@nlrb.gov
National Labor Relations Board
Region 20
901 Market Street, Suite 400
San Francisco, CA 94103-1735

Trent K. Kakuda                           Trent.Kakuda@nlrb.gov
Counsel for the Acting General Counsel
National Labor Relations Board
Sub-Region 37
P. O. Box 50208
Honolulu, Hawai`i  96850

Jennifer Cynn, Esq.                       jcynn@unitehere5.org
UNITE HERE! Local 5
1516 South King Street
Honolulu, Hawai`i  96826

I HEREBY CERTIFY that a true, accurate and correct copy of the foregoing

Petition for Review was duly served via Hand Delivery and by Email on the

following party at their last known address as follows:

Linda Dreeben                             ldreeben@nlrb.gov
Deputy Associate General Counsel
Appellate and Supreme Court Litigation
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C.  20570-0001

DATED:  San Francisco, California, August 27, 2014.

SEYFARTH SHAW LLP

BRIAN T. ASHE (Cal. SBN 139999)
Attorneys for Petitioner
MODERN MANAGEMENT SERVICES
LLC d/b/a THE MODERN HONOLULU

4

# EXHIBIT A

NOTICE This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D C 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes

**Modern Management Services, LLC, d/b/a The Modern Honolulu *and* Unite Here! Local 5.** Cases 20–CA–072776, 20–CA–080437, 20–CA–081477, 20–CA–081478, and 20–CA–083330

August 18, 2014

DECISION AND ORDER

BY CHAIRMAN PEARCE AND MEMBERS HIROZAWA AND JOHNSON

On January 23, 2014, Administrative Law Judge William L. Schmidt issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel filed an answering brief, and the Respondent filed a reply brief.[1]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs, and has decided to affirm the judge's rulings, findings,[2] and conclusions[3]

---

[1] Pursuant to *Rehant Energy*, 339 NLRB 66 (2003), we have accepted and considered both the Respondent's postbrief letter calling our attention to recent case authority and the General Counsel's letter in response.

[2] The Respondent has excepted to some of the judge's credibility findings The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd 188 F 2d 362 (3d Cir 1951) We have carefully examined the record and find no basis for reversing the findings

In addition, some of the Respondent's exceptions imply that the judge's rulings, findings, and conclusions demonstrate bias and prejudice On careful examination of the judge's decision and the entire record, we are satisfied that the Respondent's contentions are without merit

[3] For the reasons stated in his decision, we adopt the judge's finding that the Respondent violated Sec 8(a)(1) by interrogating employees Jovelyn Gecain and Florence Miguel We find it unnecessary to pass on the judge's additional finding that the Respondent unlawfully interrogated employee Amy Chow, as any such finding would be cumulative of the other interrogation findings and would not affect the remedy Member Hirozawa would adopt the judge's finding that the Respondent unlawfully interrogated Chow Member Johnson finds it unnecessary to pass on the judge's finding that the Respondent unlawfully interrogated Miguel

In adopting the judge's finding that the Respondent violated Sec 8(a)(1) by refusing employee Jenie Amogus' request for a union representative during an investigatory interview, we note that Amogus' statement at the interview, that "I need someone to be with me," sufficiently put the Respondent on notice of Amogus' desire for union representation. See *Southwestern Bell Telephone Co*, 227 NLRB 1223, 1223 (1977) (employee's right to union representation sufficiently invoked where employee remarked "I would like to have someone there that could explain to me what was happening ")

and to adopt the recommended Order as modified and set forth in full below.[4]

For the reasons stated in his decision, we adopt the judge's finding that the Respondent violated Section 8(a)(1) by surveilling employees' union activity, and by creating the impression of surveillance, when Supervisor Raymond Texeria attended a bargaining session that employees were observing, and informed employee Amy Chow that he was there to record the names of those in attendance. Contrary to our dissenting colleague's contention, the coercive nature of Texeria's conduct is not diminished by the fact that the meeting was "open." See *Heartland of Lansing Nursing Home*, 307 NLRB 152, 159 (1992) ("surveillance of employees' activities carried on in a public place" is unlawful if such surveillance involves something other than fortuitous circumstances and "involve[s] suspicious behavior or untoward conduct"); *W. T. Carter & Brother*, 90 NLRB 2020, 2025 (1950) ("even if the [respondents'] representatives] were privileged to attend [two union] meetings because of their open nature, such privilege did not extend to having a reporter take notes on the proceedings").[5] Indeed, by his own admission, Texeria did not merely attend the "open" bargaining session, but actively observed and recorded the names of the employees who chose to attend.[6]

We also adopt the judge's finding that, prior to this bargaining session, the Respondent created the impression of surveillance when, in the presence of employee Wilma Riveral, Housekeeping Director Emma Clemente instructed Texeria to attend the session, take notes of who attended, and report what happened. We find no merit in the Respondent's contention that the judge erred in finding this violation because it was not alleged in the

---

[4] We shall modify the judge's recommended Order to incorporate the standard affirmative remedies for the violations found We shall also substitute a new notice to conform to the Order as modified and in accordance with our decision in *Durham School Services*, 360 NLRB No 85 (2014).

[5] Our dissenting colleague additionally contends that *Heartland of Lansing Nursing Home*, supra, and *W. T. Carter & Brother*, supra, are not applicable because the surveillance of employees' union activities in those cases was accompanied by other acts showing employer opposition to a union's organizing effort This is a distinction without significance In both cases the unlawfully surveilled activity was, as here, open In neither case did the Board hold that evidence of additional coercive conduct was required to establish the violation

[6] We note that in contending that Texeria had a legitimate purpose for attending the bargaining session, the Respondent relied on Clemente's testimony that Texeria attended the meeting to determine whether additional employees were needed to cover for the on-duty employees who were observing the bargaining session That testimony, however, was specifically discredited by the judge We therefore find no support for our colleague's contention that Texeria "seemingly" had a legitimate reason for attending the bargaining session

2

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

complaint. The facts that form the basis of this violation were fully litigated by the parties, and the issue is closely connected to the complaint's surveillance and impression of surveillance allegations. Therefore, the judge's finding of this violation did not deprive the Respondent of due process. *Pergament United Sales*, 296 NLRB 333, 334 (1989), enfd. 920 F.2d 130 (2d Cir. 1990). Moreover, *Q-1 Motor Express, Inc.*, 308 NLRB 1267, 1268 (1992), cited by our dissenting colleague, is distinguishable. In that case, the Board declined to find an unalleged violation because the General Counsel affirmatively stated at the hearing that the evidence regarding that conduct was adduced as background for the incidents alleged in the complaint. The General Counsel made no such representation in this proceeding.

For the reasons stated by the judge, we find that the Respondent unlawfully terminated employee Juliana Alcaraz. We also adopt the judge's finding that, following Alcaraz' unlawful discharge, the Respondent violated Section 8(a)(5) and (1) by denying her access to the Respondent's facility in her capacity as an agent of the Union. We find that Alcaraz' prior employment with the Respondent provided no basis for the Respondent's unilateral denial of access. See generally *Claremont Resort & Spa*, 344 NLRB 832, 832, 834–835 (2005) (employer violated Section 8(a)(5) by refusing to allow a former employee access to its facility to perform her duties as a union representative); *Fitzsimons Mfg. Co.*, 251 NLRB 375, 379 (1980) ("It is well established that each party to a collective-bargaining relationship has both the right to select its representative for bargaining and negotiations and the duty to deal with the chosen representative of the other party."), enfd. sub nom. *Auto Workers v. NLRB*, 670 F.2d 663 (6th Cir. 1982).[7]

### ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge and orders that the Respondent, Modern Management Services, LLC, d/b/a The Modern Honolulu, Honolulu, Hawaii, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Coercively interrogating employees about their union activities, sympathies, or support on behalf of the Union, UNITE HERE! Local 5.

(b) Placing employees under surveillance while they engage in union or other protected concerted activities.

(c) Creating the impression that it is surveilling its employees' union or other protected concerted activities.

(d) Denying the requests of employees for union representation during investigatory interviews which they reasonably believe may result in discipline.

(e) Discharging employees because they engage in protected concerted activities.

(f) Denying the Union's agents access to the Respondent's facility to perform their collective-bargaining duties in accord with the customary practice the Respondent has followed since recognizing the Union as the exclusive collective-bargaining representative of its employees.

(g) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Grant the Union's agents access to the Respondent's facility to perform their collective-bargaining duties in accord with the practice followed since recognizing the Union as the exclusive collective-bargaining representative of its employees.

(b) Within 14 days from the date of this Order, offer Juliana Alcaraz full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(c) Make Juliana Alcaraz whole for any loss of earnings and other benefits suffered as a result of the discrimination against her, in the manner set forth in the remedy section of the judge's decision.

(d) Compensate Juliana Alcaraz for any adverse tax consequences of receiving backpay in one lump sum, and file a report with the Social Security Administration allocating her backpay award to the appropriate calendar quarters.

(e) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge, and within 3 days thereafter, notify Juliana Alcaraz in writing that this has been done and that the discharge will not be used against her in any way.

(f) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel rec-

---

[7] Contrary to our dissenting colleague, we find that the judge's credibility resolutions are adequately supported (see fn. 2, supra) and that there is no need to remand the Alcaraz termination allegation for more explicit findings regarding testimony that contradicts the explicitly credited testimony of the General Counsel's witnesses. "It is well established that explicit credibility resolutions are unnecessary where a judge has implicitly resolved conflicts in the testimony." *Amber Foods, Inc.*, 338 NLRB 712, 713 fn. 7 (2002).

ords and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(g) Within 14 days after service by the Region, post at the Modern Honolulu Hotel, in Honolulu, Hawaii, copies of the attached notice marked "Appendix."[1]  Copies of the notice, on forms provided by the Regional Director for Region 20, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 2011.

(h) Within 21 days after service by the Region, file with the Regional Director for Region 20 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  August 18, 2014

| | |
|---|---|
| Mark Gaston Pearce, | Chairman |
| Kent Y. Hirozawa, | Member |

(SEAL)        NATIONAL LABOR RELATIONS BOARD

MEMBER JOHNSON, dissenting in part.

I dissent in two respects.

First, I would not find either the surveillance or impression of surveillance violations.  As to the Clemente-Texeria conversation overheard by Riveral, the complaint did not allege this violation, the General Counsel never sought to amend the complaint, and he did not contend in the posthearing brief that it was unlawful.  Under these circumstances, the Respondent did not have fair notice that the judge would find the unalleged violation.  Thus, the Board has dismissed additional violations found based on evidence introduced as only background where there was no complaint allegation, no amendment was sought, and no argument was made in the General Counsel's posthearing brief.  *Q-1 Motor Express, Inc.*, 308 NLRB 1267, 1268 (1992).  The absence of an affirmative representation by the General Counsel limiting the purpose for which the evidence is introduced does not satisfy the due process requirement of putting the employer on notice of potential liability for a new, separate claim.  See *Mine Workers District 29*, 308 NLRB 1155, 1158 (1992) (simple presentation of evidence does not satisfy due process requirement that a claim has been fully and fairly litigated where respondent lacks notice that it faces liability for the particular conduct) (citing *NLRB v. Quality C.A.T.V., Inc.*, 824 F.2d 542, 548 (7th Cir. 1987)).

As to Texeria's presence at the first hotel-union bargaining session, I note that it was an open meeting which the Union had invited employees to attend.  The Respondent's negotiators, including the hotel's general manager and human resources manager, were present as well and could just as easily see and identify the employees who openly attended.  For that matter, the Union itself publicized their attendance by taking photos of the employees and the next day distributing at the workplace flyers containing their photos.  Texeria, moreover, seemingly had a legitimate reason for attending as it is undisputed that the Union and the hotel had not agreed that on-duty employees could attend.[2]  Under these circumstances, I find that Texeria's brief, open presence at the joint bargaining session is not reasonably characterized as surveillance or creating the impression of surveillance.[3]

---

[1] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[2] My colleagues note that the Respondent relied on discredited testimony by Clemente about Texeria's attendance at the bargaining session to support his having a legitimate purpose.  But the judge's credibility resolution in that regard, as with his credibility resolution concerning Alcaraz' conduct at the December 8 meeting, see infra, also lacks adequate explanation.  In any event, my conclusion that Texeria seemingly had a legitimate reason for briefly appearing at the session (to see if any on-duty employee was present there instead of working) is a reasonable inference drawn from the undisputed fact that no agreement existed permitting on-duty employees to attend.

[3] *Heartland of Lansing Nursing Home*, supra, and *W. T. Carter & Brother*, supra, cited by my colleagues, are distinguishable.  Unlike the facts of this case, the conduct in those cases found to be unlawful surveillance of employees' union activities was part of the employer's opposition to the union's organizing effort.  *Heartland of Lansing*

4

Second, although I agree that the Respondent violated Section 8(a)(5) by denying Alcaraz access as the Union's agent, I would not adopt the judge's finding that the Respondent violated Section 8(a)(1) by terminating Alcaraz. I would instead remand this issue to the judge for further explanation of his conclusion that her conduct at the December 8, 2012 meeting remained protected under the test of *Atlantic Steel Co.*, 245 NLRB 814 (1979). In so finding, the judge rejected the Respondent's version of events at this meeting based on crediting certain testimony of the General Counsel's witnesses. However, the judge failed to adequately explain his credibility determinations, failed to consider those same witnesses' testimony supportive of the Respondent's version, and ignored, without explanation, arguably corroborating testimony by two of the Respondent's witnesses who are never even mentioned in his decision. I would remand this case in the first instance for the judge to make more explicit key credibility resolutions and to address the record evidence at odds with his findings. I also do not agree with the suggestion in the judge's *Atlantic Steel* analysis that only violent or similar misconduct can cause loss of statutory protection, see *Plaza Auto Centers, Inc.*, 360 NLRB No. 117, slip op. at 15 (2014) (Member Johnson dissenting) or that the *Atlantic Steel* provocation factor favors protection even where the alleged employer provocation of an employee "outburst" is not an unfair labor practice. *Atlantic Steel*, supra at 816.

Dated, Washington, D.C. August 18, 2014

_____

Harry I. Johnson, III,                    Member

_____

*Nursing Home*, moreover, involved continuous, systematic, surreptitious surveillance by a rotating group of supervisors, without any justification, of employees' handbilling outside the facility. *W. T. Carter & Brother* likewise arose in far different circumstances The Board there found that the presence of a reporter taking notes for the respondent at two "open" union meetings was just a continuation of the respondents' earlier unlawful surveillance when its supervisors and a deputy sheriff followed the union organizers as they drove around the "company town" conducting mobile meetings with a loudspeaker *W. T. Carter & Brother*, supra at 2024 Because the respondents had also unlawfully precluded any "stationary" union meetings within the "company town," the Board concluded that the surveillance of the organizers "was not motivated solely by a desire simply to observe these roving meetings, but was also motivated by a desire to completely prevent even that type of limited meeting." Id For the same reasons, the Board found no merit, therefore, in the respondents' contention that they could lawfully send a reporter on their behalf to record the proceedings of "open" union meetings Id at 2025

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT coercively interrogate you about your union activities, sympathies, or support on behalf of the Union, UNITE HERE! Local 5.

WE WILL NOT place you under surveillance while you engage in union or other protected concerted activities.

WE WILL NOT create the impression that we are surveilling your union or other protected concerted activities.

WE WILL NOT deny your requests for union representation during investigatory interviews which you reasonably believe may result in discipline.

WE WILL NOT discharge you for engaging in protected concerted activities.

WE WILL NOT deny the Union's agents access to our facility to perform their collective-bargaining duties in accord with the customary practice we have followed since recognizing the Union as your exclusive collective-bargaining representative.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL grant the Union's agents access to our facility to perform their collective-bargaining duties in accord with the practice we have followed since recognizing the Union as your exclusive collective-bargaining representative.

WE WILL, within 14 days from the date of the Board's Order, offer Juliana Alcaraz full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Juliana Alcaraz whole for any loss of earnings and other benefits resulting from her discharge, less any net interim earnings, plus interest.

WE WILL compensate Juliana Alcaraz for any adverse tax consequences of receiving backpay in one lump sum, and WE WILL file a report with the Social Security Administration allocating her backpay award to the appropriate calendar quarters.

WE WILL remove from our files any reference to the unlawful discharge of Juliana Alcaraz, and WE WILL, within 3 days thereafter, notify her in writing that this has been done and that the discharge will not be used against her in any way.

MODERN MANAGEMENT SERVICES, LLC, D/B/A
THE MODERN HONOLULU

The Board's decision can be found at www.nlrb.gov/case/20-CA-072776 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273-1940.



*Trent K. Kakuda* and *Katrina H. Woodcock, Esqs.*, for the Acting General Counsel.
*Robert S. Katz* and *John S. Mackey, Esqs. (Torkildson, Katz, Moore, Hetherington & Harris)*, of Honolulu, Hawaii, for the Respondent.
*Jennifer Cynn, Esq. (UNITE HERE! Local 5)*, of Honolulu, Hawaii, for the Charging Party.

### DECISION

#### STATEMENT OF THE CASE

WILLIAM L. SCHMIDT, Administrative Law Judge. UNITE HERE! Local 5 (Union, Local 5, or Charging Party) filed Case 20–CA–072776 on January 18, 2012, alleging that Modern Honolulu (Respondent, Hotel, or Employer) violated Section 8(a)(3) and (1) of the National Labor Relations Act (NLRA or Act) by terminating Alcaraz. The Union filed Case 20–CA–080437 on May 4 alleging that Respondent violated Section 8(a)(1) and (5) by refusing to recognize the Union's appointed bargaining representative and by denying the representative access to its property. On May 18, the Union filed Cases 20–CA–081477 and 20–CA–081478 alleging that Respondent's agent violated Section 8(a)(1) repeatedly by coercively interro-

gating employees, and by engaging in unlawful surveillance or giving the impression of engaging in unlawful surveillance of employee union activities. On June 15, the Union filed Case 20–CA–083330 alleging that Respondent's agent violated Section 8(a)(1) and (3) by discriminating and retaliating against employee Jenie Amoguis for her union activity and by denying Amoguis' request to have union representation at an investigatory interview that led to disciplinary action.

Based on these and other charges that Union filed against Respondent that are no longer relevant here, the Regional Director for National Labor Relations Board, Region 20, issued an order consolidating the pending charges and a consolidated complaint on June 29 alleging that Respondent violated Section 8(a)(1), (3), and (5). On September 14, 2012, the Regional Director issued an order severing certain of the cases initially consolidated, and issued a second order consolidating cases and a second amended consolidated complaint in the cases set forth in the caption here alleging that Respondent violated Section 8(a)(1), (3), and (5). This pleading (the complaint) is the General Counsel's principal pleading in this case. Respondent filed a timely answer denying the substantive unfair labor practice allegations in the complaint.

I heard this case in Honolulu, Hawaii, from October 1 through 4, 2012. Having now considered the record, including the demeanor of the witnesses, together with the briefs filed on behalf of the General Counsel and the Respondent, I find that the Respondent violated Section 8(a)(1) and (5) of the Act as alleged based on the following[1]

### FINDINGS OF FACT

#### I. JURISDICTION AND LABOR ORGANIZATION STATUS

Respondent, a Hawaii limited liability company, operates the Modern Honolulu, a hotel formerly known as the Waikiki Edition, a business that provides lodging and food for its guests. During a 12-month period to August 31, 2012, Respondent derived gross revenues in excess of $500,000 from conducting this operation. During the same period, Respondent purchased and received products, goods, and materials valued in excess of $5000 from locations outside the State of Hawaii. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Respondent further admits, and I find, that Unite Here! Local 5 is a labor organization within the meaning of Section 2(5) of the Act. I further find that it would effectuate the purposes of the Act of the Board to exercise its statutory jurisdiction to resolve this labor dispute.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. Introduction

Marriott International owned this property when it operated as the Waikiki Edition. Marriott voluntarily recognized Local 5 as the collective-bargaining representative of a wall-to-wall

---

[1] In its posthearing brief, counsel for the General Counsel moved to withdraw par. 8(b) of the Second Amended Complaint. The motion is granted.

6

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

hotel industry unit on June 15, 2011,[2] but sold the property to Respondent before it concluded a collective-bargaining agreement. Respondent began operating the property on August 28 and renamed it the Modern Honolulu. It hired most of the former Marriott workers, and granted recognition to Local 5 in the existing unit.

Following recognition, the Employer voluntarily granted Local 5's assigned agents access to the hotel property.[3] Under this arrangement, union agents walked around the hotel unescorted to observe working conditions but only spoke with employees in the nonworking areas such as the locker rooms and the employee dining room. Local 5 assigned two agents to service the employees they represented at the property. Between the time of the Union's initial recognition and early 2012, these agents were Renee Togafau and Justin Jansen. They regularly visited the property to observe working conditions, and to talk with workers about their job concerns, upcoming union meetings, and the status of the contract negotiations.

This case primarily concerns workers in the Hotel's housekeeping department, a portion of the overall unit represented by Local 5. The unit includes the following nonsupervisory workers from the housekeeping department: room attendants, turndown room attendants, public area attendants, linen coordinators, housekeeping coordinators, seamstresses, and housemen. About 80 employees work in this department.

In October 2011, Respondent hired Emma Clemente as the manager of the housekeeping department. A month later, the Hotel promoted Clemente to the position of director of housekeeping and a succession of individuals succeeded her as the department manager. At the times pertinent here, Bogdanca Spiric and Alex Teng served as the housekeeping manager. The department also employed several supervisors, including Raymond Texeria who figures in the allegations here.

The housekeeping department is located in the Hotel basement. Two private offices are contained within the department's space, one for its director and the other for its manager. The nonsupervisory coordinator's desk is located in the outer space near the entrance leading to the director's private office. A large bulletin board for use in posting employee work schedules and other notices of importance to the workers is located on a wall in the large outer space of the departmental office. Employees ordinarily had unrestricted access to this area outside the private offices.

Early in its organizing campaign Local 5 established an employee committee that included workers from various Hotel departments. The committee members assisted Local 5 with its organizational activities at the property and, following recognition, they served as typical union stewards.

On November 17, Local 5 and the Hotel agreed to meet for their first collective-bargaining session on December 14. Shortly afterward, Local 5 distributed flyers in the employee dining room and the locker rooms (also used by the hotel's managers and supervisors) announcing the start of negotiations and introducing the union committee pictorially to the Hotel's workers. Housekeeping department workers pictured on this flyer included Juliana Alcaraz, Florence Miguel, Audrey Jordan-Gecain, Jovelyn Gecain, Maria Cabusas, Fapiana Esa, and Fapiki Esa.

As found below, I have concluded that the General Counsel has met his burden of proving the allegations of the complaint in this case. Specifically I find that the credible evidence demonstrates that Clemente unlawfully fired Alcaraz for her protected concerted activity. I further find that the Hotel later barred Alcaraz unlawfully from the property after Local 5 designated her as an agent to service the unit employees. In addition, the evidence shows that Clemente coercively questioned workers in the housekeeping department about their protected activities and the protected activities of other employees, and that she denied an employee's timely request for *Weingarten* representation at an investigatory interview. In making these findings, I have concluded, for a variety of reasons noted below, that various assertions made by Clemente, the key defense witness, are simply not credible. Hence, I have relied on her testimony only where it is not contradicted by other more credible witnesses. The credible evidence strongly suggests that Clemente felt that the employees' choice to be represented by a union amounted to a personal affront because of her superior managerial skills.

### B. Facts Relevant to the Unfair Labor Practice Allegations

The Hotel employs a housekeeping coordinator (a unit position) on each shift. Clemente hired Wilma Riveral as the second shift coordinator (2–10 p.m.) on October 13. About a week after Riveral's hire, Clemente began questioning Riveral about her union sympathies on several separate occasions. Clemente asked Riveral if she was "anti-union or [was on] their side." On the first occasion Clemente probed her union sympathies, Riveral merely smiled and when pressed further she told Clemente that the Union did not matter so long as she had the job.

In early October, Local 5 Organizer Jansen learned that the Hotel hired Clemente as the new department manager. Around that time, he visited the outer area of the housekeeping department on nearly a daily basis to view the work schedules and any alterations that might have been made to it. On one such occasion, Clemente approached him, introduced herself, and asked who he was. After Jansen identified himself as a union organizer assigned to the property, Clemente invited him into her office where the two had what Jansen described as a pleasant conversation that lasted about 5 minutes.

After meeting Clemente, Jansen continued to visit the housekeeping department until one day in early November when she challenged him about being in the office without her prior permission. Jansen responded by saying he did not need her permission to check the schedule. Clemente accused him of being rude and arrogant, and instructed Jenie Amoguis, the first shift

---

[2] The relevant events involving these parties occurred between August 2011 and June 2012. References in my findings to particular dates refer to the appropriate 2011 or 2012 calendar year.

[3] In an April 1 letter, Local 5 Agent Laura Moye asserted that this access arrangement provided (1) union representatives will not hand out leaflets to workers in public working areas; (2) union representatives will have access in the kitchen but will not go behind the line, and (3) union representatives will not go on guest floors to speak to housekeepers. (GC Exh 10.) Respondent never disputed her assertion.

THE MODERN HONOLULU

coordinator, to call security. A hotel security officer soon arrived and asked Jansen what he was doing to which Jansen replied that he was simply there to check the work schedule. Amoguis overheard Clemente later request that the security officer call the police but there is no indication that anyone connected with the Hotel ever summoned the police. Shortly thereafter, Jansen left the housekeeping office and went about his business.

Later that day, Clemente spoke with Riveral about her incident with Jansen that morning. During this exchange, Clemente disparaged Amoguis because she had not "saved" her from the union representative. Clemente queried Riveral as to whether she would have saved her from the union agent had she been there but Riveral did not respond. Clemente then instructed Riveral to prepare a sign saying that the outer door to the housekeeping department office must always remain closed. For the next several weeks, the door to the housekeeping department remained locked. As a result, Jansen no longer had access to the office and the employee schedules posted there.

Jansen prepared the union flyer for distribution shortly after Thanksgiving Day that announced the start of negotiations and that pictured the workers designated to serve on the Union's bargaining committee. He provided copies to the committee members for distribution in the employee dining room and the locker rooms. Later, Clemente told Riveral that the employee-committee members pictured on the Union's flyer were "problems and headaches."

Florence Miguel works at the Hotel as a full-time turndown room attendant. She began working there when Marriott operated the property. Miguel became and remained a member of the union's committee and served on its negotiating team. Miguel's husband, Ray, also worked at the hotel during this relevant period.

Miguel saw copies of the Union's flyer with her picture, among others, in the employee dining room and the women's locker room in late November or early December. After the flyer's distribution, Clemente confronted Miguel in the locker room in the presence of others seeking an explanation as to why her picture appeared in it and why the employees needed a union. Miguel told Clemente the employees needed a union for job security. Clemente scoffed at her response. She told Miguel "[Y]ou guys don't need a union because I'm a good manager." Miguel did not respond. Later, Clemente told housekeeping coordinator Wilma Riveral that she should have never hired Ray Miguel because his wife "is very strong union."

Jovelyn (Jovy) Gecain works as a housekeeper in the Hotel's public area. She also serves on the Union's committee. In late November or early December, Clemente summoned Gecain to her office over the handheld radio Gecain carries. When Gecain went to the office Clemente conducted a closed-door meeting with her. Clemente told Gecain that she wanted to get to know her. Among the inquiries Clemente made of Gecain was whether she was "union" and whether she supported the "union." Gecain responded affirmatively to both questions.

The Hotel's "Team Member Handbook" (Handbook) lists gossiping as item no. 49 on its list of 57 "House Rules" as "conduct that must be avoided." (GC Exh. 6, pp. 23–26.) The Handbook warns that the failure "to comply with any rules and policies will result in disciplinary action up to and including termination." (Id., p. 23.)

Soon after her appointment, Clemente instituted a practice of conducting two "briefings" per day for the purpose of providing the staff with updated instructions and directions. These briefings normally lasted about 15 minutes. The morning briefing began at 8:30 a.m. and the afternoon briefing began at 5 p.m.

At several of the briefings in the latter part of November, Clemente admonished employees for gossiping. Some evidence suggests that her admonishments really grew out of Clemente's concern about employees talking to "outsiders." Other evidence indicates younger workers complained of older workers gossiping on the floors during worktime. No allegation claims that Clemente sought to interfere with Section 7 activities by lecturing employees against gossiping. In discussing this topic at one or more of the briefings, Clemente made reference to "cutting tongues," or "cutting the tongue," an idiomatic expression a Filipino worker had used when she brought up the topic of gossiping early on. Despite the fact that a large majority of the housekeepers are Filipinos, some, including Juliana Alcaraz, did not understand this idiom.

Alcaraz worked with Miguel on the afternoon shift as a turndown attendant.[4] Along with Miguel, Alcaraz became very active in Local 5's organizing effort. She attended union meetings, distributed literature, promoted the Local 5 to other workers at the Hotel as well as at other properties, and soon became a member of the Union's committee at the Hotel. Her picture appeared in the Union's flyer widely distributed around the Hotel after Thanksgiving.

Miguel and several of the regular room cleaners with whom Alcaraz spoke seemed thoroughly confused about the "cutting tongue" idiom Clemente used in connection with her admonitions against gossiping. Several of the employees encouraged Alcaraz to ask Clemente for an explanation of its meaning but Alcaraz feared doing so. At the urging of some fellow workers, Alcaraz finally agreed that she would ask Clemente about the meaning of "cutting tongues" at the upcoming mandatory meeting for the housekeeping employees.

Clemente scheduled the departmental meeting for December 8 from 3 to 5 p.m. Notice of the meeting had been posted well in advance in the housekeeping office and Clemente mentioned it several times at the daily briefings. In planning the meeting, Clemente had arranged for Vital Calamur, the Hotel's general manager (also referred to by employees as "V" or Mr. V), and Jodi Ching, the Hotel's HR manager, to speak.[5] In addition, she arranged presentations by an Ecolab trainer about the cleaning chemicals the housekeepers regularly used, and by an experienced housekeeper about the proper towel-folding procedure.

The December 8 meeting was held in the outer area of the housekeeping department, an area witnesses estimated to be from 200 to 350 square feet. Approximately 60 employees

---

[4] From the start of their shifts at 1 p.m. until the dinner break at 4:30 p.m., Alcaraz and Miguel worked as regular room cleaners. After the dinner break and Clemente's afternoon briefing, their work shifted to that of a turndown attendant until the end of their day at 9 p.m.

[5] As it turned out, Calamur could not attend

8                                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

attended. Clemente set a table up in the front of the room and rows of chairs facing the table as well as along a couple of the walls. The witnesses described the atmosphere as very crowded and quite warm.

For most of the meeting, Clemente stood or sat in the front of the room to make her own presentations or to introduce the speakers. Alcaraz arrived slightly late for the meeting and stood along the back wall throughout most of the meeting. Toward the end of the meeting, Clemente called on the department supervisors to acknowledge the employees' good work. After the supervisors finished, Clemente asked for questions or comments from the employees. The noise level in the room increased considerably as several workers sought recognition to speak and others spoke up without being recognized or to voice support for comments made by others.

Alcaraz raised her hand seeking a turn to speak. When recognized, Alcaraz asked what Clemente meant when she spoke of gossiping and "cutting tongue" at the daily briefings. She added that when people speak the truth, it is not gossip. Several of the workers nodded or spoke of their agreement with Alcaraz' comment. Clemente did not respond to Alcaraz. Instead, she moved on asking if any others had comments or questions.[6]

Alcaraz raised her hand again, saying that she had not finished, that she had more to say. Someone around Alcaraz, a very slight woman, pushed her forward into the room. Clemente told her that if she still had more concerns, she should come to her office so they could discuss them further. Regardless, Alcaraz persisted in her request to speak again. When Clement said she needed to give others a chance to talk, Alcaraz blurted out, "[W]hat is this, Communist? We can't speak anymore?"

By this time, Alcaraz was close to Audrey Jordan-Gecain (Gecain or Audrey Gecain), the linen coordinator, and Clemente stood close by in the front of the room near the supervisors. Gecain caught Clemente's attention to obtain Clemente's permission to leave the room because she felt warm and uncomfortable. When Clemente nodded she could go, Gecain took Alcaraz by the arm attempting to take her along because, according to Gecain, no one was listening to her. But others supported Alcaraz' attempt to speak further. Arnold, the houseman, told Gecain, "Let Juliana speak." Gecain finally abandoned her attempt to leave and sat down.

Clemente, who had approached somewhat closer to Alcaraz and Gecain, finally relented and asked Alcaraz what she wanted to say about gossiping. Alcaraz responded saying that workers were being accused of gossiping. An exchange followed between the two that lead Clemente to insist that Alcaraz identify who had been gossiping. At first, Alcaraz refused saying she

preferred not to name anyone. Clemente, however, insisted that Alcaraz tell her who had been gossiping.[7] Finally, Alcaraz pointed her finger at Clemente and said that she had been gossiping. There is no evidence that Clemente responded to Alcaraz' accusation or that anything further happened between them at that time.

Clemente recognized several other employees who sought to speak about their workplace concerns. One, Adoracion Padilla, asked Clemente why the Filipino workers were reprimanded when they spoke around the workplace in their native language but others who spoke different languages were not. When Clemente asked Bogdanca Spiric, the housekeeping department manager who succeeded Clemente in that position, Spiric told her that the Filipino employees had never been prohibited before from talking among themselves in their native language. Another unidentified worker accused Clemente of showing favoritism toward certain workers. Florence Miguel told Clemente that she treated the workers like kids. Another worker identified only as Arnold, a houseman, accused Clemente of staging the meeting because they were union. Throughout these exchanges, the noise level in the room steadily increased. Later, Clemente described several of these workers as Alcaraz' "support group."[8] (GC Exh. 21.)

The meeting finally ended around 5:30 p.m. when Ray Miguel asked that Clemente excuse his wife, Florence, and himself. Clemente agreed but when Florence stood up she fainted and collapsed to the floor. A near-panic atmosphere erupted. Several employees began running from the room while others shouted for 911 emergency assistance. Ultimately, an EMT team arrived and transported Florence Miguel to a hospital.

After the meeting, Alcaraz returned to her usual work as a turndown attendant. At the end of her shift, she went to the housekeeping office where she met Clemente by chance. Clemente asked her to work the next day at an overtime rate because Alcaraz ordinarily did not work on Sunday. Alcaraz agreed and offered to work Sunday also but Clemente told her she would not be needed that added day.[9]

---

[6] I base my findings regarding Alcaraz' conduct during this meeting largely on the testimony of Audrey Gecain. Clemente denied that she even opened the meeting for employee comments but I find this claim unworthy of belief because of contrary testimony from several employee witnesses and the evidence that several other employees actually spoke. Unfortunately, Alcaraz, a native Tagalog speaker, chose to testify using her very limited English language skills. As a result, I found significant portions of her account about this meeting simply incomprehensible.

[7] Wilma Riveral credibly testified that Clemente used a very aggressive tone of voice when she demanded that Alcaraz identify the gossipers to whom she referred. Clemente's internal memo supports the claims of Alcaraz and Riveral that Clemente demanded that Alcaraz disclose specific names. Thus, the memo states *"When Juliana was asked who were those employees that she had mentioned gossiping* and unhappy she couldn't provide their names but instead she responded disrespectfully, "It's YOU." I was shocked myself but I didn't give her the opportunity to see me being affected by it. I stood still and calmly thank[ed] everyone for all their hard work and that all I ask is to support the leadership and authority in Housekeeping and treat everyone with respect and stop gossiping" (GC Exh 21) [Emphasis supplied]

[8] Clemente included Spiric, the department manager, as one of Alcaraz' supporters in her internal memo. (GC Exh. 21) Presumably, Spiric gained this distinction by failing to support the policy that prohibited workers from speaking Tagalog among themselves

[9] Clemente claims that she never saw Alcaraz again following the mandatory meeting until Monday, December 12, when she terminated Alcaraz. I do not credit this claim. Respondent did not dispute that Alcaraz worked overtime on Saturday, her regular day off, and provided no alternate explanation as to how Alcaraz came to be working on that Saturday

THE MODERN HONOLULU

Meanwhile, Clemente said that she offered her resignation to the hotel manager following the meeting because she became so distraught over losing control of the proceeding but Calamur refused the offer. Sometime thereafter, Clemente decided that she would terminate Alcaraz. Clemente prepared the termination paperwork over the weekend and presented it to Human Resources Manager Ching on Monday, December 12.[10] At some point Clemente also prepared an internal memorandum containing her account of the events at the December 8 meeting that the Company later produced to the Union pursuant to its request in January. This document does not specify when she prepared it. (GC Exh. 21.)

On Monday, December 12, Clemente intercepted Alcaraz before she started work and took her to Ching's office in the human resources department. There, in Ching's presence, Clemente read the termination notice to Alcaraz because she did not have her glasses. In sum, the termination form Clemente prepared accused Alcaraz, who had never received any prior discipline, of discourteousness, insubordination, bullying behavior, and gossiping at the December 8 meeting. (GC Exh. 2.) After Clemente finished reading it, she asked Alcaraz to sign the form but she refused.[11]

Alcaraz implored Ching to intervene to prevent her termination. However, Ching told Alcaraz there was nothing that she could do because Clemente made the decision to terminate her. After Alcaraz requested and obtained a copy of her discharge notice, Clemente called the security department to escort Alcaraz while she cleaned out her locker and left.

A day or two following Alcaraz' termination, Clemente directed the circulation of a petition among the housekeeping department employees expressing opposition to any attempt by Alcaraz to be reinstated to her job at the Hotel. The petition, dated December 14th, stated in part: "This petition letter should serve as a notice stating that we are not comfortable bringing back Juliana Alcaraz in our housekeeping department. We understand that Juliana Alcaraz may make an attempt to be reinstated to our department but in some reason we do not foresee a positive impact in our department." (GC Exh. 3.)

Riveral first saw the petition a day after Alcaraz' termination. According to her credible account, Clemente prodded Florimel Pasqua, the morning housekeeping coordinator at the time, to give the petition to Riveral when she came to work that day and they both asked her to sign it. Riveral disregarded their requests at the time but Pasqua gave the petition back to Riveral when she was about to leave work. Later, Riveral gave the petition to Miriam Cantora, one of the room attendants.

Over the course of the day, Clemente asked Riveral several times whether any employees had signed the petition. After a few hours, Cantora returned the petition to Riveral with several signatures on it. Riveral then returned the petition to Clemente.

Clemente kept the petition in her office. She also instructed Riveral to solicit the signatures from any of the housekeepers who had not signed it other than the "seven angry birds."[12] In addition, Clemente even asked a couple of employees in other departments, one in security and the other in engineering, to sign the petition. Riveral recalled witnessing two employees sign the petition in Clemente's office. Eventually, Riveral herself signed the petition twice. She claimed that she did so because she feared for her job. Eventually, according to Clemente, whose account I do not believe, a group of employees gave the petition to the hotel manager.

Pursuant to the agreement reached in November, the first bargaining session was held on December 14. The union agents servicing the property invited employees to attend the session held at the Hotel but no claim is made that Local 5 and the Hotel had agreed that on-duty employees could attend. Room setup arrangements show a table provided for the parties' negotiators and chairs arranged along the wall for others permitted to attend. The Local 5 negotiators consisted of six or seven Local 5 officials and unit employees. There were three Hotel negotiators, two of whom included the Hotel manager and its human resources manager.

Around the time the session was scheduled to begin, Riveral asked Clemente for permission to attend. Clemente refused. Instead, she said that Supervisor Raymond Texeria, who was present at the time, would be attending the bargaining session. Riveral overheard Clemente instruct Texeria take notes of what went on at the session and who attended. Clemente instructed Riveral to get Texeria a notebook to use for this purpose.

Amy Chow, a seamstress and a unit employee, attended the negotiations as an observer. When she saw Texeria arrive at the session, she approached him and asked what he was doing there. Texeria told Chow that he was taking down the names of the people attending the bargaining session. Later that evening, Riveral saw Texeria return to the housekeeping department office and enter Clemente's office, purportedly locking the door behind him.

Apart from Riveral's credible account, no other reliable explanation was provided as to what may have occurred inside the housekeeping offices before or after the December 14 bargaining session. Texeria did not testify and Clemente's following testimony provides yet another self-serving, contradictory, and improbable account that I do not credit:

> Q. Do you remember there was a union negotiating meeting on December 14, 2011, at the hotel?
>
> A. Yes.
>
> Q. Did you attend that meeting?
>
> A. No.
>
> Q. Do you know whether any of your supervisors attended the meeting?
>
> A. No.

---

[10] Ching reviews all disciplinary actions to ensure consistency and compliance with the Respondent's policies. However, she did not independently investigate the basis for Alcaraz' discharge, instead, this termination was based solely on Clemente's decision.

[11] At some point, during the meeting, Alcaraz sought to have a representative present. Clemente claimed that she did not know what Alcaraz meant by her request.

[12] Riveral identified the seven angry birds as the "Russian," Padilla, Amy Chow, Jenie Amogus, Audrey Jordan-Gecain, Jovy Gecain, and Florence Miguel. The "Russian" was never further identified. Presumably, "Padilla" refers to Andoracion Padilla.

10                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Q. Do you know whether any of your supervisors was at the meeting before it started?

A. No.

Q. Do you know Ray Texeria?

A. Yes.

Q. Do you know whether he was at that meeting?

A. I don't know if he was in that meeting, but Ray Texeria is a public area supervisor, and the meeting that was held at the Modern Honolulu is considered public area location.

Q. What time did the public area attendants start their work?

A. From 2:00 from 10:00.

Q. To your knowledge, was there any agreement at that time between the hotel and the Union about whether on-duty employees would be allowed to leave work and go attend the meeting?

A. No, there was not.

Q. *Did any of your supervisors tell you that they had attended the meeting on December 14?*

A. *Ray Texeria had asked me, Emma, I heard that Jovy was in the meeting, but she called in sick today. But I just want to make sure if she's there and check also the public areas in case they in a meeting and we have no replacement so I would be prepared.*

*And to me that's his area, and he has the responsibility to supervise to make sure if there's not enough people around the public area then we can call the replacement. So I said, it's your call.*

Q. *Did he tell you whether he was going to go over to the meeting area to see if Jovy was in the meeting or not?*

A. *Yes.*

Q. *And did you hear back from him later what he found out, if anything?*

A. *Yes, he came back and said that Jovy, he confirmed that Jovy was there. And I said, well, do you have a replacement for Jovy? At that time he told me that I think we're good, yeah.*

(Tr. 479–480; emphasis added.)[13]

On December 15, the Union arranged for a flyer to be distributed in the Hotel's employee dining and locker rooms. It contained a grainy black-and-white photo taken at the December 14 bargaining session along with general information about the bargaining, and a notice that the next session would be on January 17. (GC Exh. 8.) A copy of the flyer was at the dining table where Chow and Clemente ate lunch together that day. During their lunch, Clemente asked Chow to identify the employees who appeared in the blurred picture on the flyer. Chow

complied with Clemente's request using her memory of where people sat.[14]

Following her termination, Alcaraz attended the bargaining sessions held at the Hotel on December 14 and January 17. (GC Exh. 13.) Although the Employer apparently objected to the size of the Union's committee at the January 17 session, no evidence shows that it specifically objected to Alcaraz' presence on its premises at either occasion.

In March, the Union designated Alcaraz as a "Union Organizer." On March 28, the Union sent a notice to the Hotel's chief negotiator that it had designated five individuals, including Alcaraz, as its agents "to provide service to its membership effective immediately." The letter requested that the negotiator inform "all appropriate personnel of their presence at your property." (GC Exh. 4.) The Hotel's negotiator responded in an emailed letter on the same day. In pertinent part, the response stated:

> Given the circumstances of Ms. Alcaraz's termination for her *insubordinate assault* of the Director of Housekeeping, the Employer is not in Agreement with allowing Ms. Alcaraz inside the hotel. The Employer's security personnel will be advised to deny her access to the premises and will call the proper authorities in the event that she attempts to enter the interior of the Hotel.

(GC Exh. 9; emphasis added.)

On April 1, the Union emailed a letter replying to the Respondent characterizing the claim that Alcaraz had assaulted Clemente as defamatory and insisting that she should be granted access. (GC Exh. 10.) Beginning in early May and continuing through the remainder of the month, the Hotel's chief negotiator, in series of correspondence and messages exchanged with Local 5 in an effort to schedule a bargaining session, reconfirmed that Alcaraz would not be granted access to the property for any session scheduled to be held at the Hotel. In all of this correspondence, the Employer's negotiator held fast to the position even though Local 5 pointed out that Alcaraz had attended two bargaining sessions held at the Hotel following her termination. For its part, the Employer made clear that it would agree to meet and negotiate at other locations, such as the Union's office or an office of the Federal Mediation and Conciliation Service, if Local 5 insisted on Alcaraz' presence. (GC Exhs. 11–14.)

Jenie Amoguis, the morning-shift housekeeping coordinator who began working in that position while the hotel was operated by Marriott, received two disciplinary actions from Clemente in 2012, one in May and the other in June. She received the discipline at issue on Tuesday, June 12, 2012. That morning at about 9 a.m. room attendant Elifer Cabudol, a recently hired worker, complained to Clemente that Amoguis unfairly switched the room assignments between herself and a more senior room attendant on two consecutive days so as to burden Cabudol with extra work.

---

[13] During her testimony, Jovy Gecain said that she learned of the December 8 mandatory meeting, among other ways, at the 8:30 a.m. briefing. Hence, it is fair to infer, absent some evidence to the contrary of which there is none, that Jovy Gecain was a day-shift employee and that her shift would have ended at 4:30 p.m. Respondent produced no business records to support Clemente's claim contradicting the inference warranted by Jovy Gecain's testimony, or showing that Jovy Gecain took sick leave that day. Texeria did not testify at all nor was his absence explained.

[14] Clemente denied Chow's claim that she quizzed her concerning the identity of the people depicted in the flyer photograph. According to Clemente, she never has lunch with a single employee, only groups of employees. I do not credit Clemente's denial or explanation.

THE MODERN HONOLULU

Clemente immediately summoned Department Manager Alex Teng and Amoguis into the office where she questioned Amoguis about the schedule changes and, in a raised voice, accused her of giving the more difficult work to the room attendants she did not like. Amoguis apologized to Cabudol and attempted to explain to Clemente that she had assigned the rooms based on a seniority system that she had learned when she first started at the hotel during the Marriott regime. Clemente chastised Amoguis for using that system and continued to accuse her of playing favorites. With that, Amoguis put her hand up and said, "[S]top Emma, I need someone to be with me." Clemente summarily dismissed the request saying, "Why? Is Elifer not a witness? Is Alex not a witness?"[15] Then Clemente continued to press Amoguis to explain why she had switched the room assignments.

Later in the afternoon, Amoguis learned from Teng that she would receive a written warning because of Cabudol's complaint. She told Teng that wanted Audrey Gecain to be present when it occurred. When Clemente called Amoguis and Teng to her office to present the written warning, Teng told Clemente about Amoguis' request to have Gecain present but Clemente denied the request. Amoguis then stated that she wanted someone to be with her. Clemente again denied her request indicating the meeting was not an investigation but rather a write-up. In addition, Clemente told Amoguis that Gecain was on company time and that she was working. Teng then read the warning to Amoguis. She refused their request to sign it so Teng signed it for her. Later, Teng informed Amoguis that Clemente wanted Teng to make a statement asserting that Amoguis did not ask for representation and that he did not intend to lie for her. Teng did not testify nor was his absence explained.[16]

*C. Further Findings, Analysis, and Conclusions*

1. Complaint paragraphs 8(a), (c), and (d):
the interrogation allegations

The General Counsel argues that Clemente's questioning of Miguel, Gecain, and Chow violated Section 8(a)(1).[17] The General Counsel does not allege that similar questioning of Wilma Riveral by Clemente violated the Act. Instead, counsel

[15] Amoguis claimed that she wanted the assistance of linen coordinator Audrey Gecain, who is one of the Local 5 committee persons, but the evidence does not show that she made a specific request at this time to have Gecain called

[16] The General Counsel subpoenaed the statement that Teng provided about these June 12 events but Respondent petitioned to quash that statement and others of a similar nature I granted Respondent's petition finding the Teng statement to be attorney work product based on the representation of Respondent's counsel that it had been prepared and submitted through Hotel channels at his specific direction

[17] Sec 8(a)(1) prohibits employer conduct that interferes with, restrains, or coerces employees "in the exercise of the rights guaranteed in Section 7 " In part, Sec 7 provides that employees "have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection " Sec. 7 also guarantees employees the right to refrain from these activities but this case is not about the right to refrain from Sec 7 activities

for the General Counsel represented at the hearing that he had only adduced the evidence pertaining to the questioning of Riveral in order to show Respondent's animus. Based on this representation, Respondent's counsel withdrew his objection to Riveral's testimony about being questioned by Clemente and did not further pursue the issue. Hence, I find that this issue has not been sufficiently litigated to support an unfair labor practice finding as to the questioning of Riveral.

Interrogation of employees violates Section 8(a)(1) if, under all the circumstances, it reasonably "tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel Eees. & Rest. Eees. Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985). In making this determination, the Board regards it appropriate to consider the analytical factors first set out in *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964). *Medcare Associates, Inc.*, 330 NLRB 935, 939 (2000). Succinctly stated, the *Bourne* factors include: (1) the background of employer hostility toward protected employee activities; (2) any indications that the interrogator sought information for the purpose of taking adverse action against individual employees; (3) the relative position of the questioner in the company's hierarchy; (4) the place and method of interrogation; and (5) the truthfulness of any employee response. However, determining whether employee questioning violates the Act does not require strict evaluation of each *Bourne* factor. Instead, "[t]he flexibility and deliberately broad focus of this test make clear that the *Bourne* criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the 'totality of the circumstance.'" *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C. Cir. 1987).

Certain aspects of the *Bourne* factors are present in each of these three episodes alleged unlawful here; others are not. Present in all three is the fact that Clemente, the highest-ranking management official in the housekeeping department, conducted all of the questioning in issue.[18] Also, present in all three instances is the fact that each of the employees answered Clemente's inquiries truthfully. I find that the first of these two particular factors should be accorded far more weight than the latter. Based on my observations of the witnesses in this case, there can be little which debate about the significant sophistication gap that existed between Clemente and the employees in her department, including those she questioned. Even though the employees here answered Clemente's probing questions honestly, I have concluded that these employees, whether they knew it or not, had a justifiable reason to fear her inquiries, particularly Miguel and those who may have overheard this exchange in the locker room.

Clemente's questioning of Miguel exhibited pointed hostility toward employee support for union representation, which she personalized as an affront to her own position and ability. In this particular instance, Clemente pressed Miguel, a member of the union's committee, in the presence of others to justify employee support for the union and then reproached him for the answer provided, i.e., to secure employee job security. In sum,

[18] Clemente flatly denied that she questioned these three employees in the manner shown by their testimony. I do not credit her denials

12                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Clemente appeared to be using the occasion to make the point to Miguel and others nearby that, as a "good manager" she felt offended that employees had chosen union representation. I find her conduct on this occasion would restrain and coerce any reasonable employee such as Miguel, who actively supported unionization, and others who might have overheard and observed Clemente on this occasion.

Likewise, I have reached a similar conclusion with respect to the Gecain interrogation. In this instance, Clemente summoned Gecain to her office during worktime for a one-on-one meeting, ostensibly to get to know her, but which eventually led to probing this employee's union sympathies while alone in the locus of departmental authority. I have concluded that a reasonable employee would be restrained and coerced by Clemente's probing questions about a private matter in such circumstances. This is especially true where, as here, there is no apparent justification for the inquiry as well as other evidence showing Clemente's hostility toward employee support for the union.

The questioning of Chow about the specific identity of the employees who chose to attend the bargaining session on December 14 followed immediately on the heels of her direction to Supervisor Texeria to go to the meeting and take note of the employees present at that session. I find the two directions reflect a consistent pattern on the part of Clemente to identify the employees interested in the ongoing union activities.

In sum, I have concluded that Clemente's questioning in all three instances possessed a coercive quality sufficient to violate Section 8(a)(1) as alleged in complaint paragraphs 8(a), (c), and (d).

### 2. Complaint paragraphs 9(a) and (b): the surveillance allegations

Complaint paragraph 9(a) alleges that Clemente and Texeria engaged in surveillance of employees engaged in union activities. Complaint paragraph 9(b) alleges that Clemente and Texeria created an impression among employees that their union activities were under surveillance by Respondent.

Where, as here, employees openly engage in protected activities on the employer's premises, management officials may lawfully observe those activities but they may not do anything out of the ordinary to keep employee protected activities under watch. *Albertsons v. NLRB*, 161 F.3d 1231, 1238 (10th Cir. 1998). See also *Broadway*, 267 NLRB 385, 399–402 (1983), and the cases cited there. Statements by employer agents causing employees to reasonably assume that their protected activities are under surveillance violate the Act. *Tres Estrellas de Oro*, 329 NLRB 50, 51 (1999); *Electro-Voice, Inc.*, 320 NLRB 1094 (1996). Certain employer conduct may amount to unlawful surveillance and create the impression of surveillance within the same set of circumstances. *Seton Co.*, 332 NLRB 979, 981 (2000).

Respondent, relying solely on Clemente's testimony, claims that Texeria went to the December 14 negotiations session, held at the Hotel, for a legitimate purpose, i.e., "to see if Jovy Gecain and any of his other employees were there so he would know if he needed to get additional employees to ensure coverage." (R. Br., p. 55.) I reject that contention.

In this instance, Clemente's testimony, which I regard as

generally suspect anyway, is unsupported by other evidence obviously within Respondent's control. This session began at 5 p.m. Although Clemente claimed Jovy Gecain and other public area attendants worked from 2 to 10 p.m., Jovy Gecain's testimony provides a strong basis for inferring that she worked the earlier shift as she mentioned her attendance at Clemente's 8:30 a.m. briefings held for the first-shift workers who normally finish their workday at 4:30 p.m. Respondent's business records would obviously resolve any possible doubts about Jovy Gecain's normal work shift but it chose not to address this potential contradiction with its records.

In addition, Respondent chose not to use its business records to support Clemente's hearsay assertion that Texeria told her Jovy Gecain called in sick on December 14. Not only did Respondent fail to provide evidentiary support for this assertion from its business records, it also failed to call Texeria as a witness to support any of Clemente's testimony. In these circumstances, I conclude that Respondent's assertions about the legitimacy of Texeria's December 14 mission at the bargaining session lacks credible support.

By contrast, General Counsel witnesses Riveral and Chow provided accounts that are, by and large, mutually corroborative. Riveral said she overheard Clemente, who had no known assignment from the Hotel management related to the bargaining, tell Texeria to take notes at the bargaining session about who attended and what occurred. To aid him in his assignment, Clemente instructed Riveral to get Texeria a notebook. By Chow's account, Texeria told her when she arrived at the negotiating session that he came because Clemente instructed him to take note of who attended.

Both of these employee accounts provide an ample basis for concluding, as I have, that Clemente assigned Texeria to engage in surveillance. In addition, they provide an ample basis to conclude that Clemente's instruction to Texeria in the presence of Riveral, and Texeria's statement to Chow tend to create an impression of surveillance in the minds of these two employees. Based on the credible employee accounts, I have concluded that the General Counsel has proven both of the surveillance allegations by a preponderance of the evidence.

### 3. Complaint paragraphs 11 and 12: the Alcaraz allegations

#### a. Alcaraz' termination

Complaint paragraph 11 alleges that Respondent terminated Alcaraz on December 12 because of her protected concerted activities at the December 8 mandatory meeting, and because of her membership in Local 5 and activities on behalf of that labor organization. Respondent argues that even if Alcaraz engaged in protected activities at the December 8 meeting, she lost the protection of the Act by engaging in insubordinate, disruptive conduct during the meeting that warranted Clemente's discharge action.

Where an employer takes adverse action against an employee for alleged misconduct occurring in the course the employee's protected activities, the employer has the burden of showing that it held an honest belief that the employee engaged in serious misconduct. *NLRB v. Burnup & Sims, Inc.*, 379 U.S.

21, 23 (1964). If the employer meets that burden, then the General Counsel must affirmatively show that the alleged misconduct did not occur in order to establish that the employer violated the Act. *Pepsi-Cola Co.*, 330 NLRB 474 (2000), citing *Rubin Bros. Footwear, Inc.*, 99 NLRB 610 (1952).

In this case, I find that Alcaraz engaged in protected activity at the December 8 meeting by raising the question of gossip and the meaning of the cutting tongues metaphor used several times by Clemente at the daily briefings. In addition to the evidence showing that she had several discussions about this matter with other employees after Clemente addressed it at the daily briefings, the evidence also shows that Alcaraz' fellow workers encouraged her to take it up at the December 8 meeting. When Clemente failed to respond to Alcaraz' initial remarks at the meeting with anything other than asking her to take the matter up later in private, employees at the meeting supported Alcaraz' effort to speak further about the subject at that time. As the subject matter concerned an issue addressed by Respondent's rules and Clemente's own prior admonitions, I find Alcaraz was engaged in activity protected by Section 7 when she attempted to speak about the gossiping topic at the December 8 meeting. *Kiewit Power Constructors Co.*, 355 NLRB 708, enf. denied 652 F.3d 22 (D.C. Cir. 2011).

However, even though Section 7 protects the right of employees to engage in concerted activities, the Board recognizes that this does not mean that an employee is free to engage in an activity with impunity. *Stanford N.Y., LLC*, 344 NLRB 558 (2005), citing *NLRB v. City Disposal Systems*, 465 U.S.822, 837 (1984).

When an employee is discharged for conduct that is part of the res gestae of protected concerted activities, the pertinent question is whether the conduct is sufficiently egregious to remove it from the protection of the Act. *Stanford N.Y*, supra, citing *Aluminum Co. of America*, 338 NLRB 20 (2002). How egregious is "sufficiently egregious"? In the following portion of its decision in *St. Margaret Mercy Healthcare Centers*, 350 NLRB 203, 204–205 (2007), enfd. 519 F.3d 373 (7th Cir. 2008), the Board cited with approval this strict test:

> As the Seventh Circuit explained in *Dreis & Krump Mfg. v. NLRB*, 544 F.2d 320 (7th Cir. 1976), "the standard for determining whether specified conduct is removed from the protections of the Act [is] as articulated by the Board: communications occurring during the course of otherwise protected activity remain likewise protected unless found to be 'so violent or of such serious character as to render the employee unfit for further service.'" Id. at 329.

In making this determination, the Board examines the following factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice. *Atlantic Steel Co.*, 245 NLRB 814, 816 (1979).

The circumstances that lead to Alcaraz' discharge occurred in the department office near the end of the December 8 departmental meeting and well after the instructional phrase of the meeting had concluded. Respondent claims that Clemente never opened the meeting for employee comments; employee

witnesses dispute that claim. Because I regard Clemente's credibility highly suspect on virtually all contested issues, and because of the credible evidence showing that other employees concurrently voiced similar, if not more hostile, complaints about Clemente's management style,[19] I credit the employee claims that Clemente solicited employee comments at this meeting.[20] As Clemente sought employee comments about their concerns and as the meeting occurred at a location determined by management that was away from the normal work areas or any guest area, I find that this factor favors protection. *Random Acquisitions, LLC*, 357 NLRB No. 32, slip op. at 14 (noting comments were made in an office away from the work area weigh in favor of protection); *Datwyler Rubber & Plastics, Inc.*, 350 NLRB 669, 670 (2007) (outburst in a breakroom away from work areas) favored protection of employee conduct.

The subject matter factor also favors Alcaraz. She attempted to open a discussion about the admonitions concerning gossiping that Clemente raised on several occasions at daily briefings and to learn what she meant by the reference to cutting tongues. The sole response Alcaraz received from Clemente was to see her later in private. When Clemente ignored Alcaraz' effort to speak further, other employees spoke out in support of Alcaraz' effort to speak further by insisting that Clemente to "let Juliana speak." This fact strongly signals a shared interest on the part of several employees for an open discussion about gossiping around the workplace. Accordingly, I find that the subject matter favors protection. *Stanford N.Y., LLC*, supra, at 559.

Finally, both the "outburst" and provocation factors also favor Alcaraz. The fact of the matter is Alcaraz' termination did not result from any type of "outburst" at all. As Clemente's internal memo given to Local 5 in January clearly shows, it resulted from the fact that Alcaraz accused Clemente of engaging in gossiping, a subject about which Clemente herself had lectured employees several times during the daily briefings. And this accusation only occurred because Clemente insisted repeatedly that Alcaraz name the person or persons allegedly engaged in gossiping, a disclosure Alcaraz expressed reluctance to make. In short, Clemente brought the gossiping accusation for which she fired Alcaraz on herself.

Respondent's brief makes a footnote reference to Jordan-Gecain's testimony that Alcaraz commented, "[W]hat is this, Communist? We can't speak anymore?" while she was seeking to be recognized to speak again. Even assuming that it occurred, there is no indication that Clemente heard the remark. She did not mention it in her testimony, and there is no reference to it in the internal memo she wrote or in the statement inserted in Alcaraz' termination form. In short, there is no

---

[19] These included the purportedly disparate practice of discouraging or reprimanding Tagalog-speaking workers from using their language when talking among themselves in contrast to others who used their primary language without any known rebuke, Clemente's alleged propensity to treat employees like "kids," and her purported displays of favoritism

[20] Although it is true that Clemente asked for the department supervisors to provide a few laudatory words about the employees, I credit Jordan-Gecain's recollection that they had very little to say before Clemente solicited employee comments

14

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

evidence that this alleged comment had any bearing on the decision to fire Alcaraz.

For the foregoing reasons, I find that Alcaraz' conduct at the December 8 meeting did not involve either violent conduct or any type of conduct of such serious character as to render her unfit for further service. Accordingly, I find Respondent terminated Alcaraz for her protected concerted activity in violation of Section 8(a)(1) as alleged. In view of this conclusion, I find it unnecessary to consider the General Counsel's further claim that Alcaraz' termination violated Section 8(a)(3).

### b. Respondent's refusal to grant Alcaraz access to the Hotel as a union agent

Complaint paragraph 12 alleges that Alcaraz became a union agent in March and that Respondent since that time has barred her from the Hotel premises and refused to bargain with her. Respondent admits that it has barred Alcaraz from the Hotel premises because of her "assault" on Clemente at the December 8 meeting but asserts that it is willing and has bargained with the Union and Alcaraz at other locations.

It is well established that both unions and employers have the right to choose their representatives for purposes of collective bargaining or performing other labor relations activities. Absent unusual circumstances, those parties are legally obligated to deal with the party's chosen representative. *United Parcel Service*, 330 NLRB 1020 (2000). In cases of this kind, the Board seeks to determine whether there is persuasive evidence that the presence of a particular individual would create ill will and make good-faith bargaining impossible. *Neilmed Products*, 358 NLRB No. 8 fn. 2 (2012), and the cases cited there.

Although the parties appear to have focused on the ability of Alcaraz to participate in the negotiation sessions because of the Respondent's position barring her from its premises, once she became a union agent, Respondent's position precluded her from performing any functions normally performed by Local 5 agents such as meeting and speaking with employees at their workplace areas where other union agents are permitted. Hence, I find that Respondent's willingness to meet with Alcaraz anywhere but at the Hotel fails to cure this problem.

Having concluded that Respondent unlawfully terminated Alcaraz, I find it cannot justify barring her from its premises in her capacity as a union agent. Respondent failed to show that Alcaraz assaulted Clemente at the December 8 meeting as claimed or at any other time. Furthermore, Respondent has failed to provide any persuasive evidence that Alcaraz' presence on its property to perform the functions of a union agent would "create ill will and make good-faith bargaining impossible. Accordingly, I find that Respondent violated Section 8(a)(5) by barring Alcaraz from its property for the purpose of performing the usual and ordinary functions as a designated agent of Local 5.

### 4. Complaint paragraph 10: Jenie Amoguis and the *Weingarten* issue

Complaint paragraph 10 alleges that Respondent violated Section 8(a)(1) by denying Amoguis' request to be represented by the Union during the June 12 interview that she had reasonable cause to believe would result in disciplinary action against her. The General Counsel's brief makes clear that this allegation pertains only to the first Amoguis interview conducted by Clemente that day. (GC Br. at 45–47.) Respondent contends that Amoguis did not request union representation and, assuming she did, she did not do so until "all investigatory aspects of the meeting were over." (R. Br. at 56.)

Amoguis' account, which I credit, reflects that Clemente made harsh demands for Amoguis to explain Cabudol's room cleaning assignments from the outset. In the midst of this, Clemente reminded Amoguis that she had been warned before. Accordingly, I find that the tone and atmosphere of the interview along with the reference to a warning given to Amoguis the month before provided a reasonable basis for her to conclude that the interview might result in disciplinary action. When this potential result became apparent to her, Amoguis requested to have "someone" present. Respondent's assertion that the investigatory aspect of the meeting had concluded by that point lacks merit in view of the credible evidence showing that Clemente scoffed at the request and continued demands that Amoguis explain the basis for the room cleaning allocations she made among the room attendant staff.

In my judgment, the credible evidence on this issue shows that Clemente violated Section 8(a)(1) in this instance. Amoguis' request that morning to have "someone" present was sufficient to invoke her *Weingarten* rights. *General Die Casters, Inc.*, 358 NLRB No. 85 (2012). Because she failed to permit Amoguis to obtain the presence of a representative or terminate the interview, Clemente interfered with Amoguis' Section 7 rights. *General Motors Corp.*, 251 NLRB 850, 857 (1980), enfd. in part and enf. denied in part 674 F.2d 576 (6th Cir. 1982).

### CONCLUSIONS OF LAW

1. By coercively interrogating its employees about their activities or sympathies on behalf of Local 5; by engaging in surveillance of its employees' union activities and creating the impression among its employees that it was engaged in surveillance of its employees activities on behalf of Local 5; by refusing Jenie Amoguis' request for representation during an investigatory interview on the morning of June 12, 2012; and by discharging Juliana Alcaraz on December 12, 2011, Respondent engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

2. By denying Juliana Alcaraz access to the Hotel in her capacity as an agent of Local 5 after March 28, 2012, Respondent engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and (5) and Section 2(6) and (7) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

My recommended Order requires Respondent to offer Juliana Alcaraz reinstatement to her former position, or if that position no longer exists to a substantially equivalent position and

THE MODERN HONOLULU

make her whole for any loss of earnings and other benefits she suffered as a result of her unlawful termination on December 12, 2011. Backpay for Alcaraz shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No 8 (2010), enf. denied on other grounds sub. nom. *Jackson Hospital Corp. v NLRB*, 647 F.3d 1137 (D.C. Cir. 2011). In accord with *Latino Express, Inc.*, 359 NLRB No. 44, my recommended Order also requires Respondent to (1) submit the appropriate documentation to the Social Security Administration (SSA) so that when backpay is paid to Alcaraz, it will be allocated to the appropriate calendar quarters, and/or (2) reimburse her for any additional Federal and State income taxes she may be assessed as a consequence of receiving a lump-sum backpay award covering more than 1 calendar year.

My recommended Order also requires Respondent to expunge from its records any reference to Alcaraz' termination, and to notify her in writing that this action has been taken and that any evidence related to her unlawful termination will not be considered in any future personnel action affecting her. *Sterling Sugars, Inc.*, 261 NLRB 472 (1982).

Finally, my recommended Order requires Respondent to post the attached notice to employees (see Appendix) as provided in *J. Picini Flooring*, 356 NLRB No. 9 (2010).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[21]

ORDER

The Respondent, Modern Management Services, LLC, d/b/a The Modern Honolulu, Honolulu, Hawaii, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Coercively interrogating its employees concerning their activities or sympathies on behalf of UNITE HERE! Local 5 (Local 5).

(b) Engaging in surveillance of, or creating the impression that it was engaged in surveillance of employee activities on behalf of Local 5.

(c) Refusing its employees request for representation at investigatory interviews where the employee had reasonable cause to believe the interview could lead to disciplinary action.

(d) Discharging its employees for engaging in concerted activities protected by Section 7 of the Act.

(e) Refusing to grant access to agents designated by Local 5 in accord with the customary practice it has followed since recognizing that labor organization as its employee representative.

(f) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Grant access by duly designated Local 5 agents to its property in accord with the practice followed since it recognized that labor organization as a representative of its employees.

(b) Within 14 days from the date of the Board's Order, offer Juliana Alcaraz full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(c) Make Juliana Alcaraz whole in the manner set forth in the remedy section, above, for her loss of earnings and other benefits that resulted from her discharge on December 12, 2011.

(d) Within 14 days from the date of the Board's Order, remove from its files any reference to Juliana Alcaraz' unlawful discharge, and within 3 days thereafter notify her in writing that this has been done and that her December 12, 2011, discharge will not be used against her in any way in future personnel actions.

(e) Within 14 days after service by the Region, post at the Modern Honolulu Hotel in Honolulu, Hawaii, copies of the attached notice marked "Appendix."[22] Copies of the notice, on forms provided by the Regional Director for Region 20, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 2011.

(f) Within 21 days after service by Region 20, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply with this Order.

Dated, Washington, D.C.  January 23, 2014

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

---

[21] If no exceptions are filed as provided by Sec 102 46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec 102 48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[22] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

16

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT coercively interrogate our employees concerning their activities or sympathies on behalf of UNITE HERE! Local 5 (Local 5).

WE WILL NOT engage in surveillance of, or create the impression that we are engaged in the surveillance of, your activities on behalf of Local 5.

WE WILL NOT refuse your request for representation at investigatory interviews if there is reasonable cause to believe the interview could lead to disciplinary action.

WE WILL NOT discharge you for engaging in concerted activities protected by of the Act.

WE WILL NOT refuse to grant access to the Hotel by agents Local 5 designates in accord with the customary practice we have followed since recognizing Local 5 as your representative.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL grant access to the Hotel by any duly designated Local 5 agent in accord with the practice followed since we recognized Local 5 as your representative.

WE WILL offer Juliana Alcaraz full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Juliana Alcaraz whole for her loss of earnings and other benefits that resulted from her discharge on December 12, 2011.

WE WILL remove from our files any reference to Juliana Alcaraz' unlawful discharge, and notify her in writing that this has been done and that her December 12, 2011 discharge will not be used against her in any way in future personnel actions.

MODERN MANAGEMENT SERVICES, LLC, D/B/A THE MODERN HONOLULU



UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MODERN MANAGEMENT                )
SERVICES LLC, d/b/a THE MODERN   )
HONOLULU,                        )
                                 )
             Petitioner,         )        Case No. 14-1160
                                 )
        v.                       )
NATIONAL LABOR RELATIONS         )
BOARD,                           )
                                 )
             Respondent.         )
                                 )
_____)

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner Modern Management Services LLC d/b/a The Modern Honolulu

("Modern Management") is a engaged in operating The Modern Honolulu hotel in

Waikiki, Honolulu, Hawaii.  It has no parent company and no publicly-held

company has a 10% or greater ownership interest in Modern Management.

DATED:  San Francisco, California August 27, 2014.

SEYFARTH SHAW LLP

By: _____
            BRIAN T. ASHE

Attorneys for Petitioner
MODERN MANAGEMENT SERVICES LLC
d/b/a THE MODERN HONOLULU

BRIAN T. ASHE (Cal. SBN 139999)
SEYFARTH SHAW LLP
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:  (415) 397-2823
Facsimile:   (415) 397-8549
bashe@seyfarth.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true, accurate and correct copy of the foregoing CORPORATE DISCLOSURE STATEMENT was duly served by placing said documents in the U.S. Mail, First Class Postage and by Email on the following parties at their last known address as follows:

Joseph Frankl, Regional Director        joseph.frankl@nlrb.gov
National Labor Relations Board
Region 20
901 Market Street, Suite 400
San Francisco, CA 94103-1735

Trent K. Kakuda                         Trent.Kakuda@nlrb.gov
Counsel for the Acting General Counsel
National Labor Relations Board
Sub-Region 37
P. O. Box 50208
Honolulu, Hawai`i  96850

Jennifer Cynn, Esq.                     jcynn@unitehere5.org
UNITE HERE! Local 5
1516 South King Street
Honolulu, Hawai`i  96826

I HEREBY CERTIFY that a true, accurate and correct copy of the foregoing Petition for Review was duly served via Hand Delivery and by Email on the following party at their last known address as follows:

Linda Dreeben                           ldreeben@nlrb.gov
Deputy Associate General Counsel
Appellate and Supreme Court Litigation
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C.  20570-0001

DATED:  San Francisco, California, August 27, 2014.

                    SEYFARTH SHAW LLP


                    _____
                    BRIAN T. ASHE (Cal. SBN 139999)
                    Attorneys for Petitioner
                    MODERN MANAGEMENT SERVICES
                    LLC d/b/a THE MODERN HONOLULU